BRIDGET McDONNELL et al., Appellants, v. FRANK M. SHEETS et ux., Appellees.

No. 46510.

JULY 28, 1944.

Griffin & Griffin, of Sioux City, for appellants.

John J. Vizintos and Shull & Marshall, all of Sioux City, for appellees.

MULRONEY, J.— Plaintiffs brought suit in equity for a decree establishing their rights to the continued use of an easement across defendants' land in Salix, Iowa. Defendants denied that their land was burdened with the easement. The evidence showed that both tracts of land were formerly owned by A. R. Fortin. On February 6, 1913, A. R. Fortin and his wife conveyed a tract one hundred eighty-three feet by fifty feet to plaintiffs' mother, Abigail McDonnell, which left Fortin owning land on the north, west, and south of the tract conveyed. There was a highway along the east side of both tracts. The deed to Abigail McDonnell contained the following clause:

"Grantors guarantee the grantee or her assigns the privilege of ingress and egress to the rear of her property with team and wagon in such manner as grantors may from time to time designate over their land."

Plaintiffs' mother deeded the McDonnell tract to them in 1917, and Fortin transferred his remaining land to Joseph F. Chicoine, subject to the easement, in 1919. The defendants purchased from Chicoine's executor on May 13, 1943, the deed stating the conveyance was subject to the easement as described in the original Fortin deed to plaintiffs' mother.

The record is undisputed that the easement was exercised by a way located across defendants' land immediately south of the south boundary of the McDonnell tract, extending west from the highway a distance of about one hundred fifty feet. Anne McDonnell, who lived on this property purchased by her mother from Fortin for twenty-nine years, testified this driveway was twelve feet wide for about one hundred feet, then there was a jog of three feet, making the driveway fifteen feet wide for the west fifty feet. She testified that the south side of the driveway was fenced and that there was a hedge along the north side extending back from the highway about one hundred feet. She testified the fence along the south side of the driveway remained there for about twenty-five years. Then there was a period of about two years when there was no fence along the south side of the driveway, and in 1941, while Mr. Chicoine owned the property, the plaintiffs replaced the fence. This fence remained until defendants took possession of the property about two years later. She testified that there was never any gate at the place where this driveway entered the public highway and that none of defendants' predecessors in title ever claimed there should be a gate at this place. She testified that throughout the years they had used this driveway for delivering coal, groceries, gas, and fuel to the house and also to drive to the rear of the house in automobiles. Her mother did not own an automobile when she bought this property and none of the family owned one until in 1931 Peter McDonnell came back to live with his sisters and brought his car. She testified that they contemplated building a garage for her brother's car.

Her testimony as to the fenced-in driveway was supported by the widow of A. R. Fortin, who recalled this driveway with the fence along the south side that was there for thirty years and that "there was never any gate on this driveway where it goes out to the road." Bridget McDonnell, who had lived with her

sister Anne for the past twenty years, remembered when her mother bought the place. She was teaching school at the time but she was home for week ends and she testified about the line of ·bushes that was put in along the south boundary of their lot and the fence twelve feet south of this boundary at the east end and fifteen feet south at the west end that enclosed the driveway. She, too, testified that there never was any gate at the highway entrance to the driveway.

A general storekeeper in Salix, who had been there for twenty-five years and was well acquainted with plaintiffs and had delivered groceries to their home, using this driveway, testified that there was a fence along the south of the driveway and no gate at the road entrance for as long as he could remember. A trucker for a lumber and hardware company, who had lived in Salix all his life, testified:

"For a number of years I have ·been making deliveries to the McDonnell home. Their driveway is right south of the bushes south of the house, and I have used it quite often, for stove gas delivery, servicing on plumbing, hardware, during the past fifteen years. I drive in with a truck when they want some of these things. There has never been a gate on that driveway to my recollection. There has been a fence along the south side of the driveway as long as I can remember. The fence had a little jog in it near the southwest corner of the house, of about three feet to the south, and the driveway was a little wider at the back. That driveway has always been in that same place for perhaps fifteen years that I have been using it."

Mr. Rogers, who was Chicoine's renter from 1935 to 1938, recalled the driveway along the south side of the McDonnell tract. He even testified he repaired this fence along the south side a little and that there never was any gate where it opened onto the road. He testified that:

"* * * the McDonnells used the driveway for hauling coal, cobs, and the delivery men came in there with groceries. * * * they used to drive their car in there, and let it set maybe a few hours."

Defendant Sheets testified he took possession of the land in March of 1943 but he had known it all his life. He had looked it over nine years before. He stated:

"I climbed over a gate at this hedge they are talking about * * *. At that time I didn't see any marks of a roadway being used by plaintiffs. There was no road that was traveled to amount to anything. There was grass growing there then. I didn't see any definite paths in the grass, and didn't see any fence. If there was one it must have been decayed and fallen down. I traveled past that place on the road in from where I was farming for fourteen years, along in front of both places. I noticed that there was a gate there."

He removed the fence on the south side of the driveway when he went into possession.

Joseph Chicoine, the son of the former owner of the defendants' property, testified there was a fence along the south side of the lane; that they used the same lane to get to their ice house. He testified there was a gate at the lane entrance from the highway but that was before the fence was built along the south side of the driveway.

Defendants' witness, Richards, who occupied the defendants' land from 1940 to 1943, testified there was no gate at the highway entrance to the driveway when he went into possession and it was during this period that the McDonnells put up the fence along the south side of the driveway. He said he saw no evidence of an old fence where plaintiffs were erecting the fence.

I. Upon this record the trial court rendered a decree holding that an easement was created upon the defendants' land by the Fortin deed in favor of the plaintiffs' land. The decree also established and located the driveway south of the hedge along the south boundary of plaintiffs' land because this passageway had "been used by the plaintiffs and their grantor for a considerable period of time, and [had] been acquiesced in by grantor of the easement and his successors during that time." Neither party complains about this much of the trial court's ruling, save that plaintiffs point out that the decree merely establishes a twelve-foot lane while the evidence shows the lane was fifteen feet wide toward the rear. The evidence was not very clear as to the location of the jog or the necessity for a wider lane toward the rear. We are not disposed to disturb the trial court's decree as to the location or width of the driveway.

II. The most serious attack upon the trial court's decree is contained in the construction it placed on the words "team and wagon" and "in such manner as grantors may from time to time designate," found in the easement-granting clause of the Fortin deed.

With respect to the words "team and wagon," the trial court held:

"That the words 'team and wagon' refer to the type of traffic, the ingress and egress of which is guaranteed in said easement, and does not limit the type of vehicle to be employed. At the time this easement was granted passenger automobiles were in rather general use but the use of trucks for heavier traffic was not in general use and such heavier traffic, such as fuel and bulky provisions, was still moved by team and wagon. It is therefore the holding of the Court that it was the intent and contemplation of the parties to said easement that the ingress and egress guaranteed was for the movement and delivery of the heavier provisions and commodities and not for general foot travel or passenger vehicular travel, and that it would not be in constant use for unrestricted ingress and egress, and that the owners of the dominant estate, the plaintiffs in this case, are to be limited in their use of the passageway to the movement of the more weighty and bulky provisions and commodities, and that they are not entitled to use said easement for all ordinary purposes, such as a driveway for their automobile."

The plaintiffs contend the use of the words "team and wagon" referred to the width of the driveway; that "they were put there to show that it was not a mere footpath which was granted, but wide enough so that a wagon could go through, that being the method of transportation in most common use at that time." It does seem that plaintiffs' construction is the one that is most in harmony with the practical construction which the parties placed on this agreement. For about thirty years before the defendants purchased their land the plaintiffs and their immediate grantor had full and unlimited ingress and egress through the driveway without regard to the kind of vehicle or the product which was carried in and out. Nor does there seem to have been any claim made by defendants' grantors that they

could bar certain vehicles. Joseph Chicoine, defendants' witness, testified:

"When we moved there we recognized that the McDonnells had the right to drive across this [driveway] to the rear of their property * * *. While I lived there the McDonnells used the driveway for delivering groceries and cars would drive in there to come to the house; it made it more easy for them to get to the rear of their house by coming in the driveway, or lane I should say, not driveway."

There is not any evidence of any objection by Fortin or Chicoine to the McDonnells' free use of the driveway for any purpose and with any vehicle.

We think the construction which the parties placed on the wording of the grant is of considerable importance. Agne v. Slitsinger, 96 Iowa 181, 187, 64 N. W. 836, 31 L. R. A. 701; Cassens v. Meyer, 154 Iowa 187, 134 N. W. 543. And it is the general rule that where a right of way is granted it may be used for any purpose to which the land accommodated thereby may reasonably be devoted, unless the grant contains specific limitations and the grantee can avail himself of modern inventions, if by so doing he can more fully exercise and enjoy or carry out the object for which the easement was granted. Davis v. Jefferson County Telephone Co., 82 W. Va. 357, 95 S. E. 1042; Crosier v. Shack, 213 Mass. 253, 100 N. E. 607, L. R. A. 1918A, 260. The grant here guarantees to the owners of the McDonnell property the privilege of ingress and egress over defendants' land to the rear of the McDonnell property with "team and wagon." The trial court did not feel that this grant restricted the McDonnells to team and wagon only. But it did feel the words were restrictive in that they restricted "the type of traffic"—allowing only the movement of bulky provisions and commodities. It held that the plaintiffs were not entitled to use said easement for all ordinary purposes, such as a driveway for their automobile. We do not feel that such a construction can be upheld. We agree that the words "team and wagon" do not limit the type of vehicle to be employed but we also feel they do not limit the type of traffic. Once we hold that the words do not limit the type of vehicle, then the grant is unlimited.

Such words, we feel, are either a limitation on the type of vehicle or they were used merely to show that a vehicle driveway was granted, as distinguished from a footpath. It could not be doubted that the plaintiffs could have an unlimited way for a team and wagon without regard to whether the wagon was being used to haul weighty and bulky provisions and commodities. If there were a barn at the rear of the McDonnell home we do not feel the defendants could prevent plaintiffs from driving a team and wagon to and from the barn over the driveway if the wagon was not loaded with "weighty and bulky provisions and commodities." We can see no sound reason for so limiting the use of the driveway for other vehicles. It is our construction that the words "team and wagon" did not amount to a restriction on the type of vehicle or traffic.

III. The trial court construed the words "in such manner as grantors may from time to time designate" as referring to restrictions which the grantor might place upon the use of the driveway from time to time and "such restriction * * * may include a gateway through which the owner of the dominant estate may be required to pass in order to enjoy the right of ingress and egress guaranteed." Accordingly, the decree in the trial court gave the defendants the right to fence in their land up to the southern boundary of the plaintiffs' land, leaving a gate at the point where the easement enters the defendants' land and another gate along the southern line fence of plaintiffs' land. We do not agree with this construction of the easement. It seems to us that when Fortin granted the way he did not mean to reserve the manner of its use but he did reserve the right to fix the location of the driveway.

The parties seem to have carried out this intent when Fortin designated the place south of the south line of plaintiffs' property. It would seem an unnatural restriction if the granted way could, after being located, only be exercised in the manner defendants would designate. The overwhelming testimony is that a driveway with no entrance gate was used by the McDonnells for about thirty years. The trial court felt that the fence was necessary to give defendants full use of their agricultural land.

Much the same proposition was urged in Devore v. Ellis, 62 Iowa 505, 506, 17 N. W. 740, 741, where we stated:

"There is no reservation in the writing of a right to erect and maintain a fence and gate across the way. We cannot presume that such right was reserved. Indeed, we are required rather to presume that plaintiff in purchasing the way acquired the right at his option to keep it open. As it was granted for his use and convenience alone, he ought to have the right, if he so required and demanded, to use it free from all obstructions."

See, also, Kinkade v. Lyons, 235 Ky. 226, 30 S. W. 2d 963, 73 A. L. R. 775.

Defendants cite Houpes v. Alderson, 22 Iowa 160, and Amondson v. Severson, 37 Iowa 602. We do not feel these cases are in point. In the Houpes case the right of way went angling through the farm and the contract granting the right of way was not before the court. In the Amondson case it is clear that a gate-enclosed entrance was contemplated because of the requirement in the grant that the owner of the dominant estate was to maintain a gate where the roadway entered his land.

It does not appear that the McDonnell property is agricultural land. It seems to be an ordinary town dwelling. Defendants argue, and the trial court held, that to deny defendants the right to close the driveway at each end would deprive them of the full use of their land. We might point out that to grant the right to so obstruct the driveway with gates would rather effectively destroy plaintiffs' easement. A driveway one hundred fifty feet long, with gates at both ends, which the trial court held must be kept closed except when actually in use, would be of little value to plaintiffs. None of defendants' predecessors in title seem to have enjoyed such rights. We think under the facts and circumstances here plaintiffs were entitled to an open way, unobstructed by gates.

Our conclusion that the driveway could not be enclosed with gates is confined to the facts and circumstances of this case. We are aware of the general rule, as stated in annotation, 73 A. L. R. 779, that:

"* * * the grant of a way without reservation of the right to maintain gates does not necessarily preclude the owner of the land from doing so, and unless it is expressly stipulated that the way shall be an open one, or it appears from the terms of the grant or the circumstances that such was the intention, the owner of the servient estate may erect gates across the way, if they are constructed so as not unreasonably to interfere with the right of passage."

See, also, 28 C. J. S. 780, 781, section 98a.

We have interpreted the grant as not to include any restriction as to the type of vehicle or the nature of the traffic. The granted way was to serve an ordinary town dwelling with a driveway from the highway to the rear end of the lot. For about thirty years the driveway was enclosed by a south fence. We feel that under the facts in this case it was not the intention to grant a gate-enclosed driveway.

IV. The trial court taxed half the costs to plaintiffs and half the costs to defendants. While we feel that the trial court has a good deal of discretion with regard to the taxation of costs in equity cases, we fail to see any theory on which the defendants were entitled to a decree that taxed any part of the costs to the plaintiffs. The record fairly establishes that, until defendants purchased the servient estate in the spring of 1943, the plaintiffs enjoyed a driveway across defendants' land. As soon as defendants purchased the property they tore out the fence on the south side of the driveway and, according to the testimony, they started to close the driveway. According to Anne McDonnell, whose testimony was not denied, Sheets said:

"We are shutting off this driveway and all you can do about it is enjoin me if you don't like it."

In their answer defendants specifically denied that their property was burdened with the easement contained in the Fortin deed. Under this record we feel the costs of the litigation should fall on the defendants.

We reach the conclusion that the district court erred in allowing defendants to restrict the type of traffic over the driveway and in allowing it to be obstructed by gates. In all

other respects the decree of the trial court is affirmed. The costs in the trial court and upon appeal shall be taxed to the defendants.—Affirmed in part; reversed in part.

All JUSTICES concur.