Harold D. PITSENBARGER and Darlene B. Pitsenbarger, Plaintiffs,

v.

NORTHERN NATURAL GAS CO., Inc., Defendant.

Marion J. PITSENBARGER and Ralph Hunter, Trustees, and Blanche L. Pitsenbarger, Plaintiffs,

v.

NORTHERN NATURAL GAS COMPANY, Defendant.

Allen H. DAVIS and Floy M. Davis, Plaintiffs,

v.

NORTHERN NATURAL GAS COMPANY, Defendant.

Earl KERN and Evelyn E. Kern, Plaintiffs,

v.

NORTHERN NATURAL GAS COMPANY, Defendant.

Civ. Nos. 4–1004, 4–1006, 4–1009, 4–1010.

United States District Court
S. D. Iowa,
Central Division.

Sept. 29, 1961.

John Donahey, Panora, Iowa, and Robert E. Frush, Adel, Iowa, for plaintiffs.

H. R. Duncan and Eugene Davis (of Duncan, Jones, Hughes, Riley & Davis), Des Moines, Iowa, and Russell K. Craft, Adel, Iowa, for defendant.

STEPHENSON, Chief Judge.

These actions arise out of the operation by the defendant, Northern Natural Gas Company, of underground storage of natural gas in farm lands leased from plaintiffs. They were tried to the Court on the issue of liability. Originally these cases were commenced in the District Court of the State of Iowa in and for Dallas County, and were removed on the grounds of diversity of citizenship, Title 28, Section 1441, U.S.C.A. Plaintiffs are citizens of Iowa and the defendant is a Delaware Corporation with its principal place of business at Omaha, Nebraska.

At a pretrial conference it was agreed between the parties as follows:

"1. That the issue of liability be tried to the Court without a jury, and the matter of trial of the issue of damages be reserved until ruling thereon.

\* \* \* \* \* \*

"3. It is agreed that Civil No. 4–1004 entitled, Harold D. Pitsenbarger and Darlene B. Pitsenbarger v. Northern Natural Gas Company, will be tried on the issue of liability and will govern all of the issues of liability in the other cases, Civil No. 4–1006, 4–1009, and 4–1010, which are the same."

Plaintiffs' complaint is in 4 counts the substance of which are as follows: In Count I they pray that the gas storage agreement entered into by the parties be decreed unconscionable and be rescinded; in Count II they seek damages for alleged permanent injury to their freehold not compensated for by the lease agreement; in Count III they seek damages on the ground that Northern's operations constitute a permanent nuisance resulting in permanent damage to their freehold; in Count IV they seek to recover for alleged damages to their freehold upon claimed negligence of Northern under the doctrine of res ipsa loquitur. The counts are repetitious in their allegations and it is difficult to separate by counts the various allegations of the plaintiffs. The Court will therefore consider all of the issues of liability raised by the complaint and answer without regard to any particular count.

The plaintiff, Harold D. Pitsenbarger, is owner and operator of an 80 acre farm in Dallas County, Iowa, located in what has become known as the Redfield Gas Storage Area. On January 4, 1954, the plaintiffs, Harold D. Pitsenbarger and Darlene B. Pitsenbarger, his wife, hereinafter referred to as the owner(s), executed an oil and gas lease for underground gas storage exploration with the defendant (hereinafter referred to as Northern). In brief, this lease authorized Northern to carry on exploration for natural gas and oil deposits under the owner's land and "for the primary purpose of carrying on geological, geophysical and other exploratory work, including core drilling, and the drilling, mining and operating for underground structures which may be suitable for use as a storage reservoir for gas." (This instrument was released December 8, 1954).

On May 5, 1954, owners executed a Gas Storage Agreement (hereinafter referred to as the agreement) concerning said 80 acres granting Northern

"\* \* \* the exclusive right, privilege, lease and easement to explore for, establish and operate a gas storage reservoir and project thereunder and thereon by the introduction and injection of natural gas or gaseous vapors (all herein referred to as gas) into any geological stratum or strata suitable for such a reservoir such stratum or strata not

previously containing oil or gas in commercial quantities, and underlying said land at a depth of not less than one thousand (1,000) feet nor more than four thousand (4,000) feet; to store gas in said reservoir and retain the possession of gas so stored as personal property; and in connection therewith and with other exploratory operations incident thereto, the further right, privilege and easement to conduct geological and geophysical surveys and to drill and install, maintain, renew, operate and remove at locations selected by Northern such wells, pipelines, electric lines and other facilities, structures, equipment and appurtenances as Northern may deem necessary or desirable therefor; to remove therefrom all property placed in or on said land by Northern, including well casing; to have the right of ingress and egress to and across said land at convenient points; all as a part of and in connection with a gas storage project for the storage of gas to be conducted on and under said land and lands adjacent to and in the vicinity thereof."

The agreement further provided for the initial payment of $400 ($5 per acre) to the owners for a period of one year with provision for automatic extension for an additional period of one year upon annual payments of $160 ($2 per acre) to owners. The agreement further provided that Northern shall pay to owners:

"3. * * * (a) For each storage or observation well (and its appurtenances) drilled on said land a sum determined by applying the rate of $0.10 per square yard of that land which Northern determines to be necessary for its use with respect to the operation of such well after its completion, such well site, as so determined, to be in the form of a rectangle in all instances; (b) For each lineal rod of pipeline (inclusive of electric lines installed in the pipeline trench) not located on any public highway, $1.00. Payments for wells and pipelines shall be made promptly after their completion and installation.

"4. In addition to the payments otherwise provided for in this Agreement, Northern shall pay Owner, his successors in interest or tenants, as their respective interests may appear, all damages to growing crops and timber, fences and improvements, occasioned by the actions of Northern in exercising its rights and privileges as set out herein.

"5. Northern shall have the right to occupy, for each storage or observation well and its fixed appurtenances, a well site area, in the form of a rectangle, not to exceed 100 feet by 200 feet, and may enclose all or any part of such well site area with a lawful fence, and shall, at Owner's written request, so enclose each such well and its appurtenances.

"6. Northern shall bury and maintain all pipelines and electric lines (except where electric lines are on public highways) below plow depth, and upon the removal or abandonment of any of the facilities authorized hereunder, shall restore the surface of said land as nearly as practicable to its original condition.

"7. All tile drains that may be cut or disturbed by the exercise of any of the rights hereby granted shall be repaired by Northern in a good and workmanlike manner, with tile drains supported by substantial iron supports where required.

"8. Northern, in selecting the location for any of the above mentioned storage wells shall refrain from drilling or placing said well at a point closer than 300 feet from any existing residential dwelling unless Owner agrees, in writing, to the location of such well at a lesser distance therefrom. * * * "

Subsequent to the execution of the agreement, Northern tested and grad-

ually developed gas storage reservoirs in two sandstone formations, one approximately 1,700 feet below ground level, known as the St. Peter Reservoir and one approximately 2,700 feet below ground level, known as the Mt. Simon Reservoir. This gas storage area encompasses an area of more than 7,000 acres in the townships of Linn, Lincoln and Colfax in Dallas County, Iowa, including the owner's land. Development of this gas storage area required the drilling and operation of wells for injection and withdrawal of gas and (around the periphery of the structure) for observation purposes. At the time of the execution of the agreement with the owners, Northern had only one such well completed. Thereafter a number of wells were completed and injection of gas into the two sandstone formations was begun for test purposes. The Redfield gas storage area now has a total of 105 injection withdrawal and observation wells. This is all the wells Northern plans to drill at the present time. During preliminary exploration 54 shallow wells were drilled, all of which were plugged with cement at each point where they go from one formation of rock into another, and were cut off and capped 5 feet below ground level and backfilled. Approximately 96 billion cubic feet of gas are presently stored in the Redfield storage area during the summer months. Gas is withdrawn for sale to consumers at the average rate of 83.5 million cubic feet per day during the winter months. Large quantities of the gas in storage can never be recovered. The cost of developing this gas storage area, the first such installation in Iowa, and also Northern's first undertaking of this type anywhere, exclusive of the gas in storage, was in excess of ten million dollars.

Two wells have been drilled on the owner's premises and are known as Pitsenbarger No. 6 and Pitsenbarger No. 7. They were completed in August 1958 and pursuant to the gas storage agreement, the owner was paid $222.20 for each of said well sites, neither of which consists of more than one-third of an acre. In addition to the well sites, Northern installed a fenced-in access roadway along the northern boundary of owner's premises and laid underground pipelines across his premises. The pipelines were buried below plow depth.

In addition to the initial payment of $400 and the payments for the well sites, Northern has paid the owner the annual renewal payments, called for by the agreement, of $160 ($2 per acre) for all subsequent years, 1955, 1956, 1957, 1958, 1959, and 1960; Northern also paid the agreed rate of $1 per lineal rod of pipeline laid on his land; Northern has paid the owner for loss of crops due to the area taken for the roadway, this roadway crop loss being paid annually; and for crop loss due to pipeline and well construction. Other miscellaneous claims paid by Northern to the owner include payment of $500 in April, 1958 for loss of 5 brood sows, $402.50 in August, 1959 for loss of one cow, one calf, veterinarian fees and trucking costs and $75 for loss of a sow in May 1960.

The Court will first consider the owner's contention that the agreement is unconscionable and should be rescinded. In substance, the owner contends that Northern in entering on the owner's land, establishing wells, laying pipelines, opening roads, and operating the gas storage area, has created a permanent nuisance which prevents the owner from farming his land in the same manner as he did prior to the execution of the agreement, and that the value of the owner's land has been reduced; that some of the nuisances created by Northern are that the wells and installations on owner's land and adjacent lands emit noxious fumes, create potential danger of fire and explosion, that the activities and operations disturb livestock and poultry, that fences are damaged and gates left open permitting livestock to escape, wells and waters are polluted by gas seepage, making them unsavory and unfit for consumption; that the various

nuisances have made the raising and feeding of cattle, hogs and other livestock and poultry impractical and unprofitable; that tar and other substances toxic to livestock have been left on the premises which substances are permanent, and are difficult or impossible to discover and remove, that the operation of tile lines has been disrupted, that well sites and other facilities create farming hazards and difficulties and have lowered the productivity of the land, that dust conditions are created detrimental to health, that the noise from the operations disturbs the peace and quiet previously enjoyed by the owner; that homes and buildings have been damagd by defendant's actions, and that prudent persons are hesitant to acquire interests in property underlain by extensive gas accumulations known to be explosive and inflammatory which might break out in places and at times unknown by reason of defective workmanship, or forgotten wells, or defects in the cap rocks purportedly covering the said gas accumulation, that in fact, gas has escaped in said storage area under conditions known as a blowout; that due to all the foregoing, the owner's land has decreased in value from $475 per acre to $275 per acre.

As a consequence thereof the owner prays that the agreement be deemed an unconscionable contract, and in support thereof further contends that it was prepared by Northern who had superior knowledge and experience in the operations which were to be undertaken by them in reference to said gas storage project; that the owner had no knowledge whatever of the operations which were anticipated; that the consideration paid by Northern to the owner for said agreement was grossly inadequate to compensate the owner for the damages done to him and his premises; that Northern knew or should have known and had knowledge or should have had knowledge of the effect which said operations would have on the value of owner's land; that the owner not knowing what the permanent effects of these op-

erations would be on the value of his land and Northern so knowing should have advised owner of the damages to be expected from said operation and in so failing to advise the owner, Northern has been guilty of constructive fraud; that the owner has and will suffer irreparable damages and may be without legal remedy unless said contract be rescinded and set aside.

In defense to the prayer for rescission on the ground the contract is unconscionable, Northern contends first of all that the owner is guilty of laches; secondly, that even if laches is not present, the owner has not offered to restore Northern to the status quo and in view of the fact that Northern has invested over $10,000,000 in the project owner is unable to so restore Northern; and thirdly, that in any event, owner is barred by the five year statute of limitations of Iowa Code section 614.1, subd. 5, I.C.A.

The agreement in question was executed on May 5, 1954. This case was filed in Dallas County Iowa District Court on September 19, 1959. By that time 98 wells had been completed in the Redfield Storage Project. The two wells drilled on owner's land were completed in August of 1958, payment having been made therefor in April of 1958. At that time Northern had paid and the owner had accepted annual payments provided for by the lease for four years. Actually no claim of constructive fraud was made in the Petition originally filed. Not until the amended complaint was filed on October 14, 1960, did the owner claim there had been constructive fraud and ask rescission of the agreement.

In support of its initial defense of laches Northern cites Staly v. McNerney, 1943, 233 Iowa 1065, 10 N.W.2d 584 wherein the plaintiff sought specific performance for a written contract for the sale of real estate. Defendant, who had taken possession of the property on March 1, 1942, contended she had been misinformed as to the value of the property and the rentals therefrom. On April 16, 1942 she served a notice of

rescission on the plaintiff and tendered back the property and money received. Plaintiff brought suit on April 23, 1942 and the defendant answered claiming rescission. The court held this attempted rescission was unavailing, stating:

"It has frequently been held by this and other courts that one who desires to rescind must not only restore the parties to their status quo but must move promptly, and failure to act with reasonable promptness would indicate a ratification. Not only is defendant charged with such knowledge as was acquired by her during the summer and fall of 1941, but she had full knowledge of the facts between March 1, 1942 and April 16, 1942, the date of her notice of rescission. And she further continued to, and did, ratify the contract by continuing in possession of the Pennsylvania Avenue properties and collecting the rents therefrom." Id., 233 Iowa at page 1074–1075, 10 N.W.2d at page 589.

In Edmunds v. Ninemires, 1925, 200 Iowa 805, 204 N.W. 219, the defense raised to a foreclosure action was that there was a false representation. To a claim of fraud and prayer of rescission, the Court answered as follows:

"The deed was executed and delivered to appellant on August 31, 1921. As we understand the record, appellant placed his son-in-law in possession of the premises. The fraud and misrepresentation, except perhaps as to a claimed shortage in acreage, must have been discoverable at the time. This action was commenced in December, 1921. In January, 1922, appellant filed an answer which contained no claim of fraud, but denied any assumption of the mortgage indebtedness. In May, following, appellant filed answer to Griffith's cross-bill, which contained no claim of fraud in the original transaction. It was not until June, 1923, that the defense of fraud and misrepresentation now urged was alleged.

"It is a familiar rule that one seeking rescission on the ground of fraud must act with reasonable promptness after discovering the fraud. * * * (citing cases) * * * Even if appellant had been entitled to rescind, he did not act within such reasonable time as to be in a position to avail himself of the right to do so." Id., 200 Iowa at pages 808–809, 204 N.W. at page 220.

■ In the instant case it is clear that at this late date, the owner is not entitled to rescind the contract. In accepting the fruits of the bargain for over five years during which Northern has invested over $10,000,000 in developing the gas storage project, the defense of laches is valid and controlling.

■■ Even aside from the question of laches, the Court, after hearing all the evidence finds the owner has failed to establish the contract is unconscionable. The owner has failed to establish any fraud, either actual or constructive on the part of Northern. It will therefore be unnecessary to consider the applicability of the statute of limitations.

■ The owner further contends that the agreement was entered into previous to the hearing, decision and order of the Iowa State Commerce Commission on Northern's application for a permit for the underground storage of natural gas and that Northern is bound by the terms of said permit which require "just and reasonable compensation for all damage to and loss of growing crops, *land*, timber, livestock, farm equipment, water wells, fences, buildings and other improvements * * *." (Emphasis added.) That Northern in accepting said permit to operate said gas storage facilities is legally liable to pay the damages occasioned by its activities as set out in said permit, which includes permanent damages to the land. An examination of the permit granted Northern by the Iowa State Commerce Commission indicates that this contention is completely without merit.

Paragraph 12 of the permit provides as follows:

"That petitioner will pay just and reasonable compensation for all damage to and loss of growing crops, land, timber, livestock, farm equipment, water well, fences, buildings and other improvements proximately resulting from any of the petitioner's operations hereunder; *provided that nothing herein shall prohibit or restrict the petitioner from settling and compromising such damages and loss with the landowner or other interested parties, or prohibit or restrict the petitioner and land-owners or other interested parties from entering into valid and binding agreement concerning such damages and loss.*" (Emphasis added.)

It is clear that nothing in the permit prohibits or restricts the parties from entering into a valid and binding agreement concerning damages and loss which may result as a consequence of operating the gas storage area. The agreement entered into by the owner and Northern, as previously set out, clearly designates the damages which Northern will pay. In this agreement there is no provision for payment for any decrease in the fair market value of the land.

Even when a grantee has agreed to pay for all damages to the "premises", the Eighth Circuit in O'Connor v. Great Lakes Pipe Line Co., 1933, 63 F.2d 523, refused to allow recovery for decline in the fair market value of the grantor's land. In complete accord with the O'Connor case is Williams v. Northern Natural Gas Company, D.C.N.D.Iowa 1955, 136 F.Supp. 514 wherein Judge Graven likewise refused recovery where the contract provided for payment for damages to "premises."

In view of the O'Connor and Williams cases, it is clear that owner's claim for damages for the alleged decrease in the fair market value of the land is without merit.

■■ This is not to say that under no circumstances would Northern be liable for a decrease in the fair market value of the land. Any attempt to increase its servitude upon owner's property by enlarging on the terms of the easement would present an entirely different question. Generally speaking a grantee of an easement is allowed to do what is reasonably necessary to fully enjoy the rights granted him under the easement. E. g., Williams v. Northern Natural Gas Company, supra; Scheeler v. Dewerd, 1950, 256 Wis. 428, 41 N.W. 2d 635; cf. McDonnell v. Sheets, 1944, 234 Iowa 1148, 15 N.W.2d 252, 156 A. L.R. 1043. What conduct falls within the proper use of an easement and what does not are to a large extent questions of fact. Certainly it cannot be said that here, where there was no limit in the agreement as to the number of wells Northern could dig and in fact only two wells were dug on owner's 80 acres, both of which were on his northern boundary line, there is any question but that Northern's conduct in exercising its rights under the easement has been entirely proper.

■ The owner further contends that operation of the gas storage area by Northern constitutes a permanent nuisance resulting in permanent damages to his freehold which entitles him to damages for the difference between the fair market value of his land prior to the execution of the agreement and its present value. Northern denies the existence of a nuisance and further contends if any such nuisance existed, it was authorized and licensed by the owner. The question of what conduct constitutes a nuisance generally resolves itself to a question of fact and involves a determination of whether there is an unreasonable interference with the interest and the use and enjoyment of the complainant's property. In answering this question, "(T)he reasonableness of the interference is determined by weighing the gravity of the harm to the plaintiff against the utility of the defendant's conduct." Prosser on Torts, 2nd Ed.,

Sec. 72. While the Iowa legislature has outlined certain conduct as constituting a nuisance, it is not a modification of the common law rule applicable to nuisances. See Ch. 657 Iowa Code (1958) I.C.A. and Schlotfelt v. Vinton Farmers' Supply Company, Iowa 1961, 109 N.W.2d 695. In weighing the utility of Northern's conduct we must consider its rights under the agreement in relation to the alleged gravity of the harm claimed by the owner. However, a license to carry on a particular trade or business does not give the licensee permission to carry it on in such a manner as to constitute nuisance.

Many of the alleged nuisances charged to Northern are interferences with the owner's use and enjoyment of his property which were clearly contemplated by the agreement and for which compensation was specifically provided.

The agreement provides: "4. * * Northern shall pay owner * * * all damages to growing crops * * * fences and improvements * * *. 7. All tile drains that may be cut or disturbed * * * shall be repaired by Northern." Northern has never denied its liability for damages to fences, crops, interference with tile lines, and there is no claim that Northern has refused to pay for these items. In fact, as previously indicated herein, numerous payments have been made for these items. The owner further contends that tar and other substances toxic to livestock have been left on the premises and the evidence shows that Northern paid damages to the owner for loss of livestock as a result of their consuming such substances. Another alleged nuisance claimed by the owner consists of dust conditions. These are clearly incidental to the rights granted Northern under the easement. In Williams v. Northern Natural Gas Co., supra at page 517 of 136 F.Supp., Judge Graven discussed the rights of a grantee under a pipeline easement as follows:

"It is generally stated that the grantee of an easement is entitled to do what is reasonably necessary for full and proper enjoyment of the rights granted him under the easement. * * * (citing authorities) * * * The purposes for which an easement is granted have great bearing upon what rights the easement holder possesses and to what uses he may subject the property. * * * (citing authorities) * * * 'The extent of an easement created by a conveyance is fixed by the conveyance.' 5 Restatement, Property § 482 (1944). It has been said that if the details of an easement are obscure, a 'reasonably convenient' use is intended. 2 American Law of Property § 8.66 (1952). * * *"

▇ Northern had the right to exercise the rights expressly granted under the agreement and to do such other things that are incidental to or reasonably necessary for the full enjoyment of those rights.

"It seems clear from the authorities that the liability of a pipe line company for damages occasioned by it in the use of a pipeline is as follows: if the type of damage for which recovery is sought is one for which the company specifically agreed to compensate the owner of the servient estate, the company is liable even though it is not guilty of negligence; if the item of damage is not one for which the company specifically agreed to compensate the owner of the servient estate, it is liable only if it is guilty of negligence. 4 Summers, The Law of Oil and Gas § 759 (1927); Tiffany, op. cit. supra, § 771a (Supp.1955). An owner of the servient estate seeking to recover from the company on the latter ground has the burden of establishing that the company was guilty of negligence. 4 Summers, op. cit. supra, § 759." Id., 136 F.Supp. at pages 519–520.

The owner makes no claim that Northern has failed to pay for any of the items of damages provided for in the

agreement. Neither does the owner claim that Northern has failed to pay for any specific damages arising out of the negligence of Northern or its employees. However, the owner contends the actual operation of the gas storage area has resulted in a disturbance of the owner's rights and the use and enjoyment of his property clearly beyond the terms of the contract and beyond the contemplation of the parties at the time the agreement was entered into and therefore constitutes a nuisance. The owner alleges that there is a danger of fire and explosion which has produced fear and unrest in the area so as to seriously disturb the peace and quiet of the residents; that the noise and odor arising from the blowing-off the gas wells seriously interferes with the owner's right to quiet enjoyment of his premises, and that escaping gases from the storage area have caused contamination of wells in the neighborhood. In connection with these allegations, the owner offered testimony of other residents of the storage area including Mr. and Mrs. Earl Kern, plaintiffs in Civil No. 4–1010. This evidence was received by the court subject to the objections of Northern that it was immaterial and irrelevant to any issue of liability in Civil No. 4–1004. It was and is the view of the Court that in light of the nature of the nuisances charged that testimony of other residents of the gas storage area was material to the issue of whether or not Northern created a nuisance as to the owner Pitsenbarger. The Court will therefore consider the testimony of other residents of the area and since plaintiffs' attorneys advised the Court that they were submitting all the evidence of this as to all plaintiffs, consideration of this testimony will remove any doubt as to the Court's view of the existence of a nuisance as to any of the plaintiffs.

The court finds there has been some unrest and uneasiness arising out of the fear of possible fire and explosion as the result of the operations of the gas storage area. Since Northern commenced operations in 1954 there have been three so-called blasts, gas-blowouts or explosions none of which, however, have resulted in any fire. On October 5, 1955, there was a gas blow-out on the Broderick farm in the storage area. E. Vincent Martinson, engineer and director of underground storage for Northern testified that this occurred during the drilling of a well; that drilling "mud", forced down into the earth to carry the rock cuttings to the surface and also to retain the gas in the storage area injected from other wells, was lost by escaping outward at some point from the bore hole. As a result, the gas came up the well bore to the drilling rig. In addition mud and water spouted forth into the air and water bubbled up in a nearby creek bed. Northern advised certain safety precautions to be taken; aircraft were warned not to fly directly overhead; farm operators on the farms where the gas and mud erupted were asked not to operate their tractors for a day and not to light fires out of doors. The only well casing in place was 265 feet of surface casing. Since then the drilling methods have been revised; a string of intermediate casing is set into the top of the tight Maquoketa formation. Consequently, none of the formations down to 1,200 or 1,300 feet would be subjected to gas pressure if such occurrences happen again. No such incidents of this nature have occurred since 1955.

Mr. Martinson further testified that during the course of operations, especially during the wintertime when gas is being withdrawn from the wells, it is necessary to release some of the gas to the atmosphere for a minute or so. This is done to clear the well bore of hydrates and water which have collected. Such collections cause a decrease in the flow of gas from the well. This procedure has come to be known as "blowing off" a well. Some of the wells need to be blown off two or three times a week, while others have reached a stage of development where they require little or no blowing off. On February 26,

1961, another mishap occurred in the storage area. At the Hagerman No. 4 well a length of pipe carrying gas into the well failed during injection because it had been stopped by a plug of hydrates. A Northern employee opened the well to the atmosphere. The valve on this length of pipe caused the pressure to decrease to atmospheric pressure on one side of the hydrate plug. When the valve was closed the hydrate plug shifted through about eight feet of pipe against the closed valve which caused the pipe to fail. He further testified that all the wells will be heated and insulated at these points during another season's operations and consequently no more such incidents should occur.

The third of these gas blowouts occurred during the construction period when a truck backed into a pipe and valve causing gas to escape. These gas blowouts understandably caused a certain amount of apprehension by the residents of the area.

The owner contends gas is a fugitive substance and will escape to the earth's surface and since these incidents have occurred they are likely to happen again and that the condition has become inherently dangerous. Dr. Charles N. Brown, Assistant Iowa State Geologist, testified that the Maquoketa cap rock which is 1,200 feet below ground level furnishes a gas tight cap for this reservoir and that no gas can escape to the surface. Likewise, this is in substance the testimony of Mr. Martinson. Detection devices are in constant use which are sufficiently sensitive to detect any escaping gas. It is said they are so sensitive they pick up the smoke of a cigarette. Considering all of the evidence, the Court is satisfied that the gas storage area is not inherently dangerous nor have the operations been carried out in such a manner as to amount to a danger or hazard to the residents of the area. The owner has failed to establish that the operations of the gas storage area constitute a nuisance.

The owner further contends that the operation of the gas storage reservoir is a nuisance because it causes contamination of water wells situated in the area. In his deposition taken November 4, 1959, the owner testified "I haven't had any trouble with my wells, but I did have trouble with the crick (sic) that cuts down through my place here." Apparently this resulted from chemicals draining into the creek while a well was being dug in the vicinity and that was only a temporary problem during the digging. During the trial the owner testified that he dug a new well in the spring of 1961 and that a funny taste had developed in the water. Witnesses Mr. and Mrs. Earl Kern (plaintiffs in Civil No. 4–1010) testified that they had had a 300 foot well with good water until the spring of 1957 when it started tasting bad and subsequent tests from the State Hygienic Laboratory in Iowa City indicated it was "bacterially unsafe". Mr. Gilson Turner, another witness, who lived just outside the reservoir area testified that his well water turned from good to bad and had a sulphur odor. Professor Gwinn of the Iowa State University Geology Department testified that if a large amount of gas escaped from the reservoir it could pick up particles and rile the water and cause it to become cloudy. On cross examination he stated he had not studied any samples from the Redfield area. Dr. Charles N. Brown testified that in his opinion the contamination found in the Kern well was due to surface water seeping into their well. He further testified that the Maquoketa cap rock, the top of which is 1,250 feet below the surface of the earth in the Redfield storage area is gas tight and therefore that no gas could escape into the water wells. He stated that from the inception of the Redfield project until 1959, he had kept in very close contact with it. In 1954 and 1955 he worked closely with Northern and examined borings of rock formations, was present when observation holes were dug, advised in the installation of observation equipment, and ad-

vised and assisted in the developing of recording devices used by Northern.

After reviewing all the evidence, the Court finds that the owner has failed to establish that his well or any wells in the area were contaminated by leakage of gas from the reservoir and therefore, the reservoir does not constitute a nuisance in that regard.

The owner further contends that the blow-off of wells in the storage area constitutes a nuisance on account of the noise which frightens livestock and causes them to run and further that it is disagreeable to people living in the area. In addition to the noise, it is alleged at times there is an odor of gas fumes which is obnoxious. There was some variance in the testimony of witnesses as to the noise. For instance, Mrs. Kern testified that when a well blew off 40 rods away you would have to cease conversation. Mr. Glenn testified that the noise was objectionable up to 80 rods from the well.

Without setting out the evidence in detail, the Court finds that Northern was required to release a small amount of gas to the atmosphere, or to blow-off certain wells, particularly in the wintertime in order to clear the well both of hydrates and water which had collected in the pipes and caused a decrease of gas flow. The blowing-off of the wells would create a high pitched noise audible some distance from the wells, the exact distance of which would depend upon wind and atmospheric conditions at the time of the blowing-off. This blowing-off of wells (which is always done between the hours of 6:00 A.M. and 9:00 P.M.) has caused some running of livestock, the amount of which has decreased as the livestock have become accustomed to the noise; at times the noise is disagreeable to residents within the area; as the wells have been developed the amount of blowing required is continually being reduced; changes are being made in the well structures to decrease the formation of hydrates and reduce the necessity for blow-offs. Further study is being made in search of a muf-fler for the sound. The odors which have penetrated the atmosphere as a result of the blow-off of the wells have not been as serious a problem as the noise, but there has been some odor detectable at times. The Court finds that the blow-off of the wells by Northern has been a necessary feature to the normal operation of the gas storage area; that reasonable care has been used by Northern to reduce the disagreeable effect of the noise, concerning the number of times blowing off is necessary, and in addition have done everything possible to reduce the ill effects of blow-offs of gas. The blowing off of the wells comes within the concept of doing "what is reasonably necessary for the full and proper enjoyment of the rights granted (Northern) under the easement." Williams v. Northern Natural Gas Company, supra, 136 F.Supp. at page 517. Under all the circumstances, the owner has failed to establish that the blowing off of gas constitutes a nuisance. It appears to the Court that Northern is attempting to take advantage of new inventions and discoveries for the improvement of their operations so as to minimize the ill effects such as the noise and odor herein described. If and when devices become available which eliminate or decrease the noise and odor of gas during the blow-offs which Northern refuses to employ without reasonable cause, an entirely new question would be presented.

After considering all of the evidence the Court finds that the operations of Northern in the gas storage area do not constitute a nuisance.

Finally the owner contends that all of the discomfort and inconveniences he alleges as constituting a nuisance arose as a result of the negligence of Northern in its operation of the Redfield gas storage area; that he is entitled to rely on the doctrine of res ipsa loquitur and that this negligence has resulted in the reduction of the market value of his property from $475 an acre to less than $275 an acre. As indicated in discussing the owner's charge that Northern created a nuisance, the owner is not

complaining that any specific injury resulted to him or his property which has not been compensated for aside and except for the alleged decrease in the fair market value of his property. It appears to the Court unnecessary and repetitious to discuss again the matters alluded to in discussing owner's charges that Northern created a private nuisance. All injury and damages suffered by the owner (aside from those for which specific provision is made in the contract) which might be attributed to Northern's negligence, such as the injury to livestock, the owner has been compensated for. There remains only the charge that on account of the negligence of Northern in the construction and operation of the Redfield storage area the owner has been damaged by the permanent depreciation in the market value of his land. Assuming the doctrine of res ipsa loquitur applicable, Northern has successfully rebutted any inference of negligence that inheres in the owner's claim that said negligence is the proximate cause of the decrease in the fair market value of his land.

The Court therefore finds that the owner has failed to establish any negligence on the part of Northern in the construction and operation of the Redfield gas storage area which is the proximate cause of any decrease in the fair market value of the owner's land.

The Court therefore finds that Northern, having paid the owner for all damages set out in the storage agreement and for all items of specific damage charged to Northern's negligence, there are no sums due and owing to the owner.

It is the holding of the Court that the plaintiff has failed to establish that the defendant is liable for any damages not heretofore paid by the defendant.

It Is Ordered that judgment shall be entered for the defendant.

It Is Further Ordered that under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., this Memorandum shall constitute findings of fact, conclusions of law and Order for Judgment.